1  Michael J. Aguirre, Esq., SBN 060402
   Christopher S. Morris, Esq., SBN 163188
2  Maria C. Severson, Esq., SBN 173967
   AGUIRRE, MORRIS & SEVERSON LLP
3  444 West C Street, Suite 210
   San Diego, CA 92101
4  Telephone:  (619) 876-5364
   Facsimile:  (619) 876-5368
5
   Attorneys for Plaintiff
6

7

8              UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11  MICHAEL J. AGUIRRE,                Case No. '09 CV 2556 JAH    POR

12              Plaintiff,             COMPLAINT FOR DECLARATORY
                                       JUDGMENT; PRODUCTION OF FOIA
13      v.                             RECORDS

14  UNITED STATES DEPARTMENT OF
    THE TREASURY,
15
                Defendant.
16

17

18

19

20

21

22

23

24

25

26

27

28

---
                            COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

JURISDICTION AND VENUE ............................................................................1

PARTIES .............................................................................................................2

FACTS .................................................................................................................2

    A.    AIG's BAILOUT ................................................................................2

           MAIDEN LANE II ..............................................................................4

           MAIDEN LANE III .............................................................................4

    B.    PRESIDENTIAL MANDATE OF OPENNESS .................................6

    C.    THE REQUEST AND EXHAUSTION OF REMEDIES ...................7

    D.    THE U.S. TREASURY HAS POSSESSION OF THE
           REQUESTED DOCUMENTS ............................................................9

    E.    TO DATE, THE U.S. TREASURY HAS FAILED
           TO PRODUCE THE DOCUMENTS ...............................................12

FIRST CAUSE OF ACTION ............................................................................12
(Request for declaratory judgment under 28 U.S.C. §2201)

SECOND CAUSE OF ACTION ........................................................................13
(Request for records improperly withheld in violation of FOIA)

PRAYER FOR RELIEF.....................................................................................13

i

**INTRODUCTION**

1.     Plaintiff seeks production of schedules of Residential Mortgage Backed Securities (RMBS) and Collateral Debt Obligations (CDOs) purportedly transferred to special purpose vehicles organized by the U.S. Treasury Department (U.S. Treasury) and the Federal Reserve System (Federal Reserve), named Maiden Lane II and Maiden Lane III.

2.     These RMBS and CDO schedules are readily available to U.S. Treasury. The schedules were identified in Form 8-Ks filed by AIG with the U.S. Securities & Exchange Commission (SEC). The underlying RMBS and CDOs were audited by Deloitte & Touche and the written audit is at the Federal Reserve website at http://www.newyorkfed.org/markets/maidenlane2.html.

3.     The U.S. Treasury has refused to honor its legal duty to produce the schedules under the Freedom of Information Act ("FOIA"). Plaintiff served the first FOIA request over 180 days ago on 7 May 2009. On 1 September 2009 Stephen A. Moffett, Administrative Officer, Office of Financial Stability, represented in writing that no records were located that were responsive to the request for the schedules of the collateral pledged for the Maiden Lane II and III transactions involving the transfer of over $55 billion.

4.     Plaintiff was informed on 1 September 2009 that the Treasury would not comply as it allegedly did not have the responsive documents. On 22 September 2009 Plaintiff appealed that decision. On 20 October 2009 the U.S. Treasury advised in writing that the Treasury's initial response was correct, and invited a lawsuit in the United States District Court in accordance with 5 U.S.C. § 552(a)(4)(B). Having exhausted his administrative remedies, Plaintiff brings this suit to compel the U.S. Treasury to discharge its obligations under FOIA so that the public can be informed of how the Federal Reserve and U.S. Treasury are safeguarding the public's money.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States, in particular, 5 U.S.C. §552. In addition, this Court has jurisdiction over this action pursuant to 5 U.S.C. §552(a)(4)(B), under which, "the district court of the United States in the district in which the complainant resides, or has his

1

1  principal place of business...has jurisdiction to enjoin the agency from withholding agency

2  records and to order the production of any agency records improperly withheld from the

3  complainant," because, among other things, Plaintiff lives in this District.

4        6.     Venue is proper in this District pursuant to 5 U.S.C. §552(a)(4)(B) and 28 U.S.C.

5  §1931 because, among other things, Plaintiff's principal place of business is in this District.

6  **PARTIES**

7        7.     Plaintiff is an attorney with the law firm of Aguirre, Morris & Severson LLP.

8  Plaintiff is a resident of this district and has his principal place of business at 444 W. C Street,

9  Suite 210, San Diego, California 92101. Plaintiff is currently investigating and litigating against

10 American International Group ("AIG"). As part of the investigation, Plaintiff is following the

11 trail of money, decisions, and transactions that led to the bailout as well as the subsequent events

12 and effects. The purpose of the investigation is to inform and protect the taxpayers of California.

13 In total, the goal of the investigation is to protect those insured by AIG and its subsidiaries and

14 affiliates, and to ensure that they will be able to collect on any claims or benefits they may have.

15       8.     Defendant U.S. Treasury is an agency of the United States of America, and has

16 possession and control of the records that Plaintiff seeks. According to the U.S. Treasury, it is

17 charged with serving the American people and strengthening national security by managing the

18 U.S. Government's finances effectively, promoting economic growth and stability, and ensuring

19 the safety, soundness, and security of the U.S. and international financial systems.

20 **FACTS**

21 **A.    AIG's BAILOUT**

22       9.     In May 2007, AIG's stock prices sat at or around $72.00. After AIG's investors

23 were made aware of AIG's high risk exposure to spread-based lending and its credit default swap

24 programs, the stock price fell to under $2.00 on or around May 2008. Furthermore, AIG

25 shareholder equity dropped from $95 billion to $52 billion between 2007 and 2008. Cash flow

26 from operating activities decreased from $14 billion in 2006 to negative $99 billion in 2008.

27      10.    Federal government officers transferred directly or indirectly over $55 billion

28 primarily to 5 banks while those 5 banks and AIG were engaged in questionable and perhaps

2

1   unlawful financial transactions.  Before its bailout by federal government officers, AIG was a

2   company with a long history of engaging in illegal financial transactions.  As late as August 2009,

3   the SEC found the man who ran AIG for 30 years used AIG to commit massive fraud. The former

4   head himself has documented alleged fraud committed by his successors in the upper

5   management at AIG.

6        11.    In exchange for the over $55 billion bailout, AIG or an AIG counterparty

7   transferred financial products -- RMBS and CDO -- to the special purpose vehicles federal

8   officials formed to accommodate the AIG bailout, named Maiden Lane II ("ML II") and Maiden

9   Lane III ("ML III").

10       12.    The related transaction documents, as detailed below, required a written

11  itemization of the RMBS and CDO attached schedules. These readily available schedules of

12  RMBS and CDOs are the subject of the FOIA request.

13       13.    On Monday, 15 September 2008, AIG lost its AAA credit rating.  AIG's 2008 10-

14  K explains how and why this happened:

15       Under AIG's securities lending program, cash collateral was received from

16       borrowers in exchange for loans of securities owned by AIG's insurance company
         subsidiaries. The cash was invested by AIG in fixed income securities, primarily
         residential mortgage-backed securities (RMBS), to earn a spread. During

17       September 2008, borrowers began in increasing numbers to request a return of
         their cash collateral. Because of the illiquidity in the market for RMBS, AIG was

18       unable to sell RMBS at acceptable prices and was forced to find alternative
         sources of cash to meet these requests. As of the end of August, AIG's

19       U.S. securities lending program had approximately $69 billion of borrowings
         outstanding.

20

21       Additionally, throughout the second half of 2008, declines in the fair values of the
         super senior multi-sector CDO securities protected by AIGFP's credit default swap

22       portfolio, together with ratings downgrades of the CDO securities, resulted in
         AIGFP being required to post significant additional collateral. As of the end of

23       August 2008, AIG had posted approximately $19.7 billion of collateral under its
         super senior credit default swap portfolio.

24       14.    The U.S. Treasury and the Federal Reserve Board released a joint statement on 16

25  September 2008 saying that the Federal Reserve "with the full support of the Treasury

26  Department" was committed to help AIG restructure itself and continue on as a viable company.

27  Similarly, former Secretary of the Treasury, Henry M. Paulson, Jr., issued his own release.  He

28  stated that the Department of Treasury is "working closely with the Federal Reserve, the

3

[Securities and Exchange Commission ("SEC")] and other regulators to…assist AIG." The U.S. Treasury and the Federal Reserve on 2 March 2009 announced a restructuring of their assistance to AIG.

**MAIDEN LANE II**

15.   According to its financial statement audit as of 31 December 2008, Maiden Lane II LLC (a Special Purpose Vehicle consolidated by the Federal Reserve Bank of New York ("FRBNY")) is a Delaware limited liability company that was formed to acquire RMBS from the reinvestment pool of the securities lending portfolio of several regulated U.S. insurance subsidiaries of AIG.

16.   On 12 December 2008 Maiden Lane II purchased from AIG RMBS with a purported proximate fair value of $20.8 billion, determined as of October 31, 2008.  Maiden Lane II financed this purchase by borrowing $19.5 billion from the FBNY and deferral of $1 billion of the purchase price.

**MAIDEN LANE III**

17.   According to its audited financial statement for the period as of 31 December 2008:

> Maiden Lane III LLC (a Special-Purpose Vehicle consolidated by the Federal Reserve Bank of New York) (the "LLC") is a Delaware limited liability company that was formed on October 14, 2008 to acquire Asset-Backed Security Collateralized Debt Obligations ("ABS CDOs") from certain third-party counterparties of AIG Financial Products Corp. ("AIGFP"). In connection with the acquisitions, the third-party counterparties agreed to terminate their related credit derivative contracts with AIGFP.

18.   Five banks received much of the $55 billion of federal funds through AIG on the AIG lending and credit protection transactions. Contrary to the sophisticated public relations campaign, these payouts to banks were made in the face of collateral call clauses in the respective contracts between AIG and the banks:

| Bank | Amount (billion) |
|------|------------------|
| Goldman Sachs | $12.9 |
| Societe Generale | $11.9 |
| Deutsche Bank | $11.8 |

4

| Bank of America/Merrill Lynch | $10.2 |
| Barclays Bank | $8.5 |

19.    The agreements documenting the Maiden Lane II and III transactions provided for schedules to be completed showing the CUSIP number and security name, amongst other information. On 12 December 2008, AIG Life Insurance Companies (as defined below), all wholly owned U.S. life insurance company subsidiaries of AIG, and AIG Securities Lending Corp. (the "AIG Agent"), another AIG subsidiary, entered into the Asset Purchase Agreement (the "Asset Purchase Agreement") with ML II, a Delaware limited liability company whose sole member is the New York Fed. The Asset Purchase Agreement included an attached schedule that was to be completed as part of the transaction listing out the RMBS transferred to Maiden Lane II as part of the loan transaction with the U.S. Treasury and Federal Reserve.

20.    The agreements documenting the Maiden Lane II and III transactions provided for schedules to be completed showing the CUSIP number and security name, amongst other information for the RMBS and CDOs transferred to the government in connection with the transactions.  The names from whom the subject schedules could be obtained by U.S. Treasury officials are clearly included in each of the signature pages of the related Asset Purchase Agreements.

21.    The U.S. Treasury has represented to the American People that its official policy is to act with transparency in particular with the bailout:

> The Department of the Treasury is committed to transparency and accountability in all of its programs and policies, including all programs established under the Emergency Economic Stabilization Act (EESA).  Under the new Financial Stability Plan, Treasury will implement new enhanced measures to ensure greater transparency and accountability for all of its programs under the EESA. In addition to these actions, Treasury has developed a productive working relationship with TARP oversight bodies including the Government Accountability Office, the TARP Special Inspector General, the Congressional Oversight Panel, and the Financial Stability Oversight Board. **Contracts**: As part of Treasury's effort to keep taxpayers informed about TARP activities, Treasury announced on January 28, 2009, that it will begin posting redacted investment contracts for future transactions on Treasury's web site within five to ten business days of a transaction's closing.  For transactions that have already closed, Treasury will publicly post contracts on a rolling basis until all investment agreements are available on the web site.

22.     The U.S. Treasury states on its website that "as its authorities permit" it "will seek to remove from the Federal Reserve's balance sheet, or to liquidate, the so-called Maiden Lane facilities made by the Federal Reserve as part of efforts to stabilize systemically critical financial institutions."

23.     The U.S. Treasury website also identifies the massive government bailout of AIG as part of the Statistically Significant Failing Institutions program which is interdependent with the joint Treasury-Federal Reserve bailout through Maiden Lane II and III.  The funding provided by the U.S. Treasury was directly related to the funding provided by the Federal Reserve to AIG:

> The purchase of $40 billion of senior preferred stock in the American International Group (AIG) under the terms of the SSFI Program was announced on November 10, 2008 and completed on November 25, 2008. This purchase will allow the Federal Reserve to reduce the total amount available under the credit facility established in September-- before TARP resource were available--from $85 billion to $60 billion and to restructure the terms and conditions associated with that facility.

**B.     PRESIDENTIAL MANDATE OF OPENNESS**

24.     On January 21, 2009, one day after taking office, President Barack Obama issued a memo directed to the heads of executive departments and agencies.  The memo was entitled Transparency and Open Government.  The memo announced that his administration was committed to creating an unprecedented level of openness in Government.  The memo announced his intention to establish a system of transparency, public participation and collaboration between governmental departments and the people.  He announced that "[o]penness will strengthen our democracy and promote efficiency and effectiveness in Government."  He continued on about the accountability that comes from transparency, the dispersion of knowledge that accompanies participation, and how collaboration engages the public and fosters participation.

25.     On March 19, 2009, Attorney General Eric Holder issued a follow up memo to President Obama's memo to the department heads.  In his memo, he stated that FOIA should be "administered with a clear presumption: In the face of doubt, openness prevails."  In explaining what this meant, he explained two implications.  First, an agency should not use technicalities to withhold information; just because the agency can withhold it should not mean that it does.  Second, agencies should strive to provide as much information as it can if it cannot make a full

6

1   disclosure.  This partial disclosure, he explains, is a reasonable step that departments should take

2   in order to release nonexempt information.

3   **C.      THE REQUEST AND EXHAUSTION OF REMEDIES**

4         26.     On 7 May 2009, Plaintiff submitted to the U.S. Treasury, by facsimile and United

5   States Postal Service, a FOIA request (assigned number 2009-05-022, and attached hereto as

6   Exhibit 1) seeking documents related to MLII.  The request sought six categories of documents:

7   1) any agreement where MLII is a party, 2) a list of AIG subsidiaries that were involved in MLII

8   transactions, 3) a copy of the Asset Purchase Agreement, 4) a copy of the credit agreement

9   amongst the Fed and MLII, 5) closing documents for the asset purchase and lending agreements

10  described above, and 6) any additional documents and transactions which include any distribution

11  of funds documentation, correspondence and emails amongst and between the various parties to

12  the agreements described above.

13        27.     On 8 May 2009, Plaintiff submitted to the U.S. Treasury, by facsimile and United

14  States Postal Service, a FOIA request (assigned number 2009-05-023, and attached hereto as

15  Exhibit 2) seeking documents related to MLII.  The request sought the completed Annex A and

16  Annex B for the MLII Asset Purchase Agreement.

17        28.     On 8 May 2009, Plaintiff submitted to the U.S. Treasury, by facsimile and United

18  States Postal Service, a FOIA request (assigned number 2009-05-024, and attached hereto as

19  Exhibit 3) seeking documents related to Maiden Lane II.  The request sought the documents

20  showing the identity of each transaction making up the MLII portfolio.  In the request, Plaintiff

21  specified the need to identify the originator of the loans, when the loans originated, if they were

22  securities, the identity of any securitizer, and the date of securitization.  Further, he also asked for

23  any documents relating to AIG and if they were involved in the underlying transactions as

24  originator or securitizer.

25        29.     On 11 May 2009, Plaintiff submitted to the U.S. Treasury, by facsimile and United

26  States Postal Service, a FOIA request (assigned number 2009-05-026, attached hereto as Exhibit

27  4) seeking documents related to MLIII.  The request sought the documents showing the Schedule

28  A list of transactions compromising the $53 billion in notational value as part of the Shortfall

1   Agreement between MLIII and AIGFP.  Plaintiff also sought the documents showing the names

2   of the parties to the derivative transactions on Schedule A, the dates of the transactions, all

3   counterparties to the transactions, the amounts of each individual transaction, the nature of the

4   transaction, the underlyings for each transactions and any related correspondence or emails.

5   Moreover, he asked for the forward purchase agreement between the counterparty to the

6   Derivative Transactions and MLIII, documents showing the names of any counterparties, the

7   dates of such agreements, the amounts for such agreements, and any related correspondence or

8   emails.  Finally, the Shortfall Agreement stated that MLIII had delivered collateral to the

9   counterparties; he sought the documents showing the collateral and the counterparties.

10       30.     On 8 May 2009, U.S. Treasury Director of Disclosure Services, Hugh Gilmore,

11   responded to the 7 May 2009 request saying that the U.S. Treasury could not process the request.

12   In the letter, Mr. Gilmore stated that all requests need to be accompanied by an agreement to pay

13   applicable fees.

14       31.     Between 8 May and 14 May 2009, Plaintiff and Mr. Gilmore as well as Tom

15   O'Connor of the U.S. Treasury sent various communications back and forth.  On 14 May 2009,

16   Plaintiff submitted to the U.S. Treasury, by facsimile and United States Postal Service, a letter

17   that relayed and affirmed that he would agree to pay $25 for each request in order to meet the

18   FOIA regulations.

19       32.     Plaintiff was informed in writing on 1 September 2009 that the U.S. Treasury

20   would not comply as it allegedly did not have the responsive documents. (Exhibit 5, attached

21   hereto.)

22       33.     On 22 September 2009 Plaintiff appealed the decision of the U.S. Treasury.

23   (Exhibit 6, attached hetero.) On 20 October 2009 the U.S. Treasury advised in writing of its

24   position that the Treasury's initial response was correct, and invited a lawsuit in the United States

25   District Court in accordance with 5 U.S.C. section 552(a)(4)(B). (Exhibit 7, attached hereto.)

26       34.     Having exhausted his administrative remedies, Plaintiff brings this suit to compel

27   the U.S. Treasury to discharge its obligations under FOIA in compliance with both the law and

28   the President's mandate, so that the public can be informed of how the Federal Reserve and U.S.

8

1  Treasury are safeguarding the public's money.

2        35.     The public has a significant and legitimate interest in the U.S. Treasury's conduct

3  with respect to AIG, Maiden Lane II and III, and the Federal Reserve because they are enacting

4  transactions involving taxpayer money.  When the Federal Reserve uses public money, taxpayers

5  are entitled to understand and assess the decisions and transactions it enters into with private

6  institutions.  The public's interest is particularly pronounced in light of the new expansive powers

7  of the Federal Reserve (recently dubbed "the fourth branch of government"), the new risks that

8  the Federal Reserve is taking with public money, the potential insolvency of AIG, and the

9  ongoing financial crisis and its effects on the American economy.

10        36.     As the holder of the records, the U.S. Treasury has an obligation to the people to

11  provide the transparency of these transactions.

12        37.     On information and belief, the U.S. Treasury possesses the records requested

13  above.

14        38.     The U.S. Treasury is obligated to release the records requested under FOIA unless

15  it can show that the records are exempt from disclosure.

16  **D.     THE U.S. TREASURY HAS POSSESSION OF THE REQUESTED DOCUMENTS**

17        39.     The financial relief provided in the bailout to AIG was a joint undertaking by the

18  U.S. Treasury, the Federal Reserve and the New York Fed.  The U.S. Treasury and the Federal

19  Reserve Board released a joint statement on 16 September 2008 stating that the Federal Reserve

20  "with the full support of the Treasury Department" was committed to help AIG restructure itself

21  and continue on as a viable company.

22        40.     Similarly, former Secretary of the Treasury Henry M. Paulson, Jr. issued his own

23  release.  He stated that the Department of Treasury is "working closely with the Federal Reserve,

24  the Securities and Exchange Commission ("SEC") and other regulators to...assist AIG."  The

25  U.S. Treasury and the Federal Reserve on 2 March 2009 announced a restructuring of their

26  assistance to AIG.

27        41.     The Treasury Department has announced on its website that "as its authorities

28  permit" the Treasury Department will seek to remove Maiden Lane II and III from the Federal

Reserve balance sheet to the U.S. Treasury:

> In the longer term and as its authorities permit, the Treasury will seek to remove from the Federal Reserve's balance sheet, or to liquidate, the so-called Maiden Lane facilities made by the Federal Reserve as part of efforts to stabilize systemically critical financial institutions.

42.     On 7 November 2008 Matthew Rutherford, Treasury Deputy Assistant Secretary for Federal Finance, wrote an email to Michele Davis -- then Assistant Secretary of the Treasury for Public Affairs and Director of Policy Planning -- demonstrating that the funds lent to AIG through the U.S. Treasury and the Federal Reserve where considered as one integrated exposure of the United States Government (USG). The email detailed the "total amount of current and potential exposure to the USG has to AIG before and after the potential investment." Listed on the tables were the loans made to Maiden Lane II and III. (The 7 November 2008 email is attached as Exhibit 8).

43.     The New York Fed website for Maiden Lane III specifically states the Maiden Lane III transaction was a joint effort by the New York Fed and Treasury Department:

> On November 10, 2008, **the Federal Reserve Board and the U.S. Treasury Department announced the restructuring of the government's financial support to the American International Group, Inc. (AIG)** in order to facilitate its ability to complete its restructuring process. As part of this restructuring, under section 13(3) of the Federal Reserve Act, the Federal Reserve Board authorized the Federal Reserve Bank of New York (New York Fed) to lend up to $30 billion to a newly formed Delaware limited liability company, Maiden Lane III LLC (ML III LLC), to fund the purchase of certain multi-sector collateralized debt obligations (CDOs) from certain counterparties of AIG Financial Products Corp. (AIGFP).

44.     On 16 December 2008, Stephen Albrecht, Counselor to Treasury Department General Counsel Robert Hoyt, advised James Lambright -- then Chief Investment Officer of the federal bailout program known as the Troubled Asset Relief Program (TARP) -- that the U.S. Treasury has "rights to the exact same info" as the FRBNY. Specifically, Mr. Albrecht wrote Mr. Lambright:

> Under our agreement, we will be getting the same financial reporting that FRBNY is getting under their lending facility. Our information is supposed to be sent to the TARP compliance office. Without getting into detail, I know it is a very robust set of reporting. I would suggest talking to the FRBNY to discuss the data that is being reported, what has been useful, etc., given they have been dealing with this data for a while, and we now have rights to the exact same info. (A full, true, and correct copy of the 16 December 2008 email is attached hereto as Exhibit 9)

10

45.     The term sheet between AIG and the U.S. Treasury provides that the U.S. Treasury is entitled to the same documents from AIG as the New York Fed:

> Except as otherwise agreed, AIG shall provide the UST (i) the information required to be provided by AIG to the FRBNY pursuant to Section 5.04 of the Credit Agreement, (ii) the notices required by Section 5.05 of the Credit Agreement, in each case within the time periods for delivery thereof specified in the Credit Agreement and (iii) such executive compensation information as is required for purposes of the Emergency Economic Stabilization Act of 2008 ("EESA") and the regulations and guidelines thereunder; provided that, after the termination of the Credit Agreement, such informational and notice requirements as are provided in Section 5.04 and Section 5.05 of the Credit Agreement shall remain in full force and effect until such time as the UST no longer owns any shares of Senior Preferred. In addition, AIG shall promptly provide the UST such other information and notices as the UST may reasonably request from time to time.[1]

46.     The FRBNY Credit Agreement, referenced in the loan term sheet described above, at Section 5.04 (r) provides the FRBNY the right to a broad range of information:

> (r) promptly, from time to time, such other information, including such additional regular financial, management and other reports, as the Lender shall request in consultation with the Borrower to enable the Lender to monitor the business, assets, liabilities, operations, condition, results and prospects of the Borrower and its Subsidiaries, their compliance with the terms of the Loan Documents, and the regulatory environment in which the Borrower and its Subsidiaries operate. The Borrower shall take all steps necessary or requested by the Lender to establish a reporting regime that satisfies the objective of the preceding sentence as promptly as practicable following the Closing Date.

47.     Further, in the Administration Agreement for Maiden Lane II, § 6.18 provides that nothing in the Maiden Lane II agreement "shall prevent the Administrator from disclosing any such information ... (b) upon the request or demand of any Governmental Authority."

48.     The U.S. Treasury officials who have possession, custody or control of the documents sought by the subject FOIA requests included but are not limited to the Department of Treasury Officials: Tim Geithner (Secretary) Jim Millstein (Senior Financial Restructuring Executive), Stephen A. Myrow (Chief of Staff to Deputy Secretary) Stephen Albrecht (Legal Counsel), Tom Bloom (CFO of the Office of the Comptroller of the Currency and former CFO of the Commerce Department serving as the interim Chief Financial Officer.), Donald Hammond (Deputy Director of the Division of Federal Reserve Bank Operations and Payment Systems and former Treasury Fiscal Assistant Secretary to serve as interim Chief Compliance Officer), Ken E.

---

[1]  A full, true, and correct copy of the Treasury Department loan term sheet is attached hereto as Exhibit 10.

1   Carfine (Fiscal Assistant Secretary), Gary Grippo (Deputy Assistant Secretary for Fiscal

2   Operations & Policy), Dave Monroe (Director Office of Fiscal Projections, Office of the Fiscal

3   Assistant Secretary U.S. Dept of Treasury), Sally Phillips (Cash Management Officer at U.S.

4   Department of Treasury), Via Stafford (Deputy Executive Secretary), Anthony Ryan (Acting

5   Under Secretary for Domestic Finance), and Matthew Rutherford (Deputy Assistant Secretary for

6   Federal Finance).

7        49.     Under these premises the U.S. Treasury had possession, custody or control of the

8   Maiden Lane II and III documents as admitted. These writings were clearly within the grasp of

9   the U.S. Treasury and there is no good faith basis for the U.S. Treasury disclaiming the ability to

10  locate or produce the subject documents. The delay the U.S. Treasury has occasioned should be

11  sanctioned with the award of appropriate attorneys fees and costs.

12  **E.      TO DATE THE U.S. TREASURY HAS FAILED TO PRODUCE THE
            DOCUMENTS**

13

14       50.     Under FOIA, the U.S. Treasury was required to respond to the May 7, 2009

15  request by June 5, 2009, which is 20 business days after the date in which Plaintiff submitted the

16  request.  The May 8, 2009 requests required a response by June 8, 2009, which is 20 business

17  days after the date in which Plaintiff submitted the request.  The May 11, 2009 request required a

18  response by June 9, 2009, which is 20 business days after the date in which Plaintiff submitted the

19  request.

20       51.     Defendant has made clear by its conduct and letters of September 1 and October

21  20, 2009, that it has not and will not produce any records.  Defendant is stonewalling the

22  production of these records and any further appeal would be futile.

23       52.     Plaintiff has a statutory right to the records requested.

24                          **FIRST CAUSE OF ACTION**

25                  (Request for declaratory judgment under 28 U.S.C. §2201)

26       53.     Plaintiff repeats, realleges, and incorporates the allegations in the foregoing

27  paragraphs as though fully set forth herein.

28  / / /

54.     FOIA mandates public disclosure by the U.S. Treasury of the records requested.

55.     The U.S. Treasury has not provided the records requested to Plaintiff.

56.     An actual and justiciable controversy exists as to whether the U.S. Treasury has violated FOIA.

57.     Plaintiff seeks declaratory judgment that FOIA entitles Plaintiff to the records requested and that the U.S. Treasury should produce those records immediately.

## SECOND CAUSE OF ACTION

(Request for records improperly withheld in violation of FOIA)

58.     Plaintiff repeats, realleges, and incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

59.     Plaintiff seeks disclosure of, and access to, the records requested.

60.     The U.S. Treasury was required to respond to the requests no later than June 9, 2009 or June 12, 2009, but to date, has still failed to respond.

61.     Plaintiff has exhausted its administrative remedies with respect to receiving a response to the records requested.

62.     FOIA mandates public disclosure by the U.S. Treasury of the records requested.

63.     The U.S. Treasury's failure to make the records requested promptly available to Plaintiff violates 5 U.S.C. §552(a)(3)(A).

64.     Upon substantially prevailing, Plaintiff should be awarded its attorneys' fees under 5 U.S.C. §552(a)(4)(E).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that:

1.     The Court declare that the U.S. Treasury's constructive denial by failing to respond to the substance of the request was unlawful;

2.     The Court order the U.S. Treasury to make the records requested immediately available to Plaintiff; and

/ / /

/ / /

13

1        3.     The Court grant such other and further relief as this Court may deem just and

2    proper.

3                                              Respectfully submitted,

4                                              AGUIRRE, MORRIS & SEVERSON LLP

5

6    Dated:  November 12, 2009

7                                              Maria C. Severson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT



**AGUIRRE, MORRIS & SEVERSON LLP**
ATTORNEYS AT LAW

Michael J. Aguirre, Esq.
maguirre@amslawyers.com

444 West C Street, Suite 210
San Diego, CA 92101
Telephone (619) 876-5364
Facsimile (619) 876-5368

*By Facsimile and*
   *United States Postal Service*

May 7, 2009

Honorable Timothy F. Geithner
Secretary of the Treasury
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

FOIA Request
Department of the Treasury
Washington, DC 20220

   *Re:     Freedom of Information Act (FOIA) Request for Maiden Lane II*

Mr. Secretary:

A.     This FOIA Request

       This letter requests Maiden Lane II documents.  I am requesting the documents that
identify by name the items contained in the portfolio of real estate mortgage backed securities
(RMBS) or other financial interests transferred from American International Group (AIG) or one
its entities or affiliates to Maiden Lane II.

B.     Maiden Lane II

       The 10K filed for AIG in 2009 describes the Maiden Lane II transaction as follows:

       On December 12, 2008, AIG, certain of AIG's wholly owned U.S. life insurance
       subsidiaries, and AIG Securities Lending Corp. (the AIG Agent), another AIG
       subsidiary, entered into an Asset Purchase Agreement (the ML II Agreement)
       with Maiden Lane II LLC (ML II), a Delaware limited liability company whose
       sole member is the NY Fed.

       Pursuant to the ML II Agreement, the life insurance subsidiaries sold to ML II all
       of their underlying interests in a pool of $39.3 billion face amount of RMBS held
       by the AIG Agent as agent of the life insurance subsidiaries in connection with

Honorable Timothy F. Geithner
FOIA Request
May 7, 2009
Page 2

AIG's U.S. securities lending program. In exchange for the RMBS, the life
insurance subsidiaries received an initial purchase price of approximately
$19.8 billion plus the right to receive deferred contingent portions of the total
purchase price of $1 billion plus participation in the residual, each of which is
subordinated to the repayment of the NY Fed loan to ML II.

Pursuant to a credit agreement, the NY Fed, as senior lender, made a loan to ML
II (the ML II Senior Loan) in the aggregate amount of $19.5 billion (such amount
being the cash purchase price of the RMBS payable by ML II on the closing date
after certain adjustments, including payments on RMBS for the period between
the transaction settlement date of October 31, 2008 and the closing date of
December 12, 2008).

C.      Documents Requested under this FOIA

Please provide any agreements in which Maiden Lane II is a party.  Please provide the
list of AIG subsidiaries involved in the Maiden Lane II transaction described under Heading B
above. Please provide a full, true, and correct copy of the Asset Purchase Agreement described in
paragraph B above.

Please provide a list of the RMBS and underlying assets (including amount, location,
parties to the transaction) in the pool of $39.3 billion described in paragraph B above.

Please provide a copy of the credit agreement amongst the NY Fed and ML II in the
aggregate amount of $19.5 billion, as described in paragraph B above. Please provide the closing
documents for the asset purchase and lending agreements described in paragraph B above.

Please also provide any additional documents related to the documents and transactions
set forth in paragraph B above, including any distribution of funds documentation,
correspondence and emails amongst and between the various parties to the agreements described
above.

I am requesting copies of the above-referenced documents and I agree to pay any and all
fees that might be incurred in responding to my request.

Very truly yours,

Michael J. Aguirre



# AGUIRRE, MORRIS & SEVERSON LLP
## ATTORNEYS AT LAW

444 West C Street, Suite 210
San Diego, CA 92101
Telephone (619) 876-5364
Facsimile (619) 876-5368

Michael J. Aguirre, Esq.
maguirre@amslawyers.com

*By Facsimile and*
  *United States Postal Service*

May 8, 2009

Honorable Timothy F. Geithner
Secretary of the Treasury
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

FOIA Request
Department of the Treasury
Washington, DC 20220

  *Re: Freedom of Information Act (FOIA) Request for Maiden Lane II*

Mr. Secretary:

  The Maiden Lane financial report on the New York Fed site (which is attached) states that the Maiden Lane portfolio consists of $5.226 billion in Alt-A (ARM) and $10.796 in Subprime and $2.817 in Other.  Please the provide documents showing the identity of each transaction making up the Maiden Lane II portfolio.  Please identify the originator of the loans were, when they were originated, if they were securitized, the identity of the securitizer, and the date of securitization. Please also identify if AIG was in any way involved in the underlying transactions as originator or securitizer.  Please provide any documents showing how the loan portfolio came to be owned by AIG.

  I am requesting copies of the above-referenced documents and I agree to pay any and all fees that might be incurred in responding to my request.

      Very truly yours,

      Michael J. Aguirre

Attachment



MARKETS

Foreign Exchange

Open Market
Operations

Securities Lending

Term Securities
Lending Facility

Commercial Paper
Funding Facility

Money Market
Investor Funding
Facility

Term Asset-Backed
Securities Loan
Facility

Primary Dealer Credit
Facility

∷ Maiden Lane
Transactions

Primary Dealers

Home > Newsevents > New Page

## Maiden Lane Transactions

✉ **E-mail alert**

In 2008, as part of extending support to specific institutions, under section 13(3) of the Federal Reserve Act, the Federal Reserve Board authorized the New York Fed to facilitate formation of three limited liability companies.

Maiden Lane LLC (ML LLC) was formed to facilitate the merger of the Bear Stearns Companies, Inc. and JPMorgan Chase & Co. The New York Fed extended credit to ML LLC to acquire certain assets of Bear Stearns.

Maiden Lane II LLC (ML II LLC) and Maiden Lane III LLC (ML III LLC) were formed to facilitate the restructuring of the New York Fed's financial support to American International Group (AIG). The New York Fed extended credit to ML II LLC to purchase residential mortgage-backed securities from the securities lending portfolio of several regulated U.S. insurance subsidiaries of AIG. The New York Fed extended credit to ML III LLC to purchase multi-sector collateralized debt obligations from certain counterparties of AIG Financial Products Corp.

More detailed description of each of the Maiden Lane transactions, along with certain information on each company's assets and liabilities is provided below.

### Maiden Lane I   Maiden Lane II   Maiden Lane III

On November 10, 2008, the Federal Reserve Board and the U.S. Treasury Department announced the restructuring of the government's financial support to American International Group, Inc. (AIG) in order to facilitate its ability to complete its restructuring process. As part of this restructuring, under section 13(3) of the Federal Reserve Act, the Federal Reserve Board authorized the Federal Reserve Bank of New York (New York Fed) to lend up to $22.5 billion to a newly formed Delaware limited liability company, Maiden Lane II LLC (ML II LLC), to fund the purchase of residential mortgage-backed securities (RMBS) from the securities lending portfolio of several regulated U.S. insurance subsidiaries of AIG (AIG Subsidiaries).

**Transaction Overview**
ML II LLC was formed in the fourth quarter of 2008. On December 12, 2008, ML II LLC purchased RMBS with an estimated fair value of approximately $20.8 billion, determined as of October 31, 2008, (Asset Portfolio). ML II LLC financed this purchase by borrowing $19.5 billion (Senior Loan) from the New York Fed. The Senior Loan proceeds, after adjustments (totaling $0.3 billion between October 31, 2008, and December 31, 2008) including principal and interest payments received by the AIG Subsidiaries on the RMBS, were used to purchase the $20.8 billion Asset Portfolio. In addition to receiving the cash purchase price on the closing date, AIG Subsidiaries received a contingent right to collect the deferred portion of the total purchase price of $1.0 billion (Fixed Deferred Purchase Price) plus a one-sixth participation in the residual portfolio cash flow, if any, each following ML II LLC's repayment of the Senior Loan and accrued interest thereon to the New York Fed.

As of October 31, 2008, the Asset Portfolio had a par value of approximately $39.3 billion.

The New York Fed has all material control rights over the Asset Portfolio and is the sole and managing member of ML II LLC.

**Significant Transaction Terms**
The Senior Loan and the Fixed Deferred Purchase Price are secured by the Asset Portfolio. The Senior Loan was issued with a stated term of six years, and may be extended at the New York Fed's discretion.

The interest rate on the Senior Loan is one-month LIBOR plus 100 basis points. After the Senior Loan to the New York Fed has been repaid in full plus interest, to the extent that there are sufficient remaining cash proceeds, the AIG Subsidiaries will be entitled to receive the Deferred Fixed Purchase Price, plus accrued interest at a rate of one-month LIBOR plus 300 basis points.

After repayment in full of the Senior Loan and the Fixed Deferred Purchase Price (each including accrued interest), any remaining proceeds will be split 5/6th to the New York Fed and 1/6th to the AIG Subsidiaries.

Distribution of the proceeds realized by the Asset Portfolio (including interest proceeds and proceeds from the maturity or liquidation of the Asset Portfolio) will occur on a monthly basis, and will be made in the following order (each category must be fully paid before proceeding to the next lower category):

- *first*, to pay any costs, fees and expenses of ML II LLC then due and payable;
- *second*, to fund the expense reimbursement sub-account to $500,000 or such other amount as may be specified by the New York Fed;
- *third*, to pay the outstanding principal amount of the Senior Loan;
- *fourth*, so long as the entire outstanding principal amount of the Senior Loan has been repaid in full, to pay unpaid interest outstanding on the Senior Loan accrued at LIBOR plus 100 basis points;
- *fifth*, so long as the entire outstanding principal amount and all accrued and unpaid interest outstanding on the Senior Loan have been paid in full, to repay the outstanding principal amount of the Fixed Deferred Purchase Price;
- *sixth*, so long as (i) the entire outstanding principal amount of and all accrued and unpaid interest on the Senior Loan have been paid in full and (ii) the entire outstanding principal amount of the Fixed Deferred Purchase Price has been repaid in full, to pay unpaid interest outstanding on the Fixed Deferred Purchase Price accrued at LIBOR plus 300 basis points;
- *seventh*, so long as the entire outstanding principal amount of and all accrued and unpaid interest on the Senior Loan and the Fixed Deferred Purchase Price have been paid in full, to pay 5/6th of all remaining amounts to the New York Fed and 1/6th of all remaining amounts to the AIG Subsidiaries (each as Contingent Interest).

**Management of Assets**
BlackRock Financial Management Inc. (Investment Manager) has been retained by the New York Fed to manage the Asset Portfolio.

The Investment Manager's objective in managing ML II LLC's portfolio is maximization of long-term cash flows to pay the Senior Loan (including principal, interest, and Contingent Interest), subject to the need to meet other obligations in the waterfall that are senior to the Senior Loan and refraining from investment actions that would disturb general financial market conditions.

Cash proceeds from the Asset Portfolio may be invested solely in U.S. Treasury or agency securities with a remaining maturity of one year or less, U.S. 2a-7 government money market funds, reverse repurchase agreements collateralized by U.S. Treasury and agency securities and dollar denominated deposits.

**ML II LLC Annual Financial Statements, year ended December 31, 2008** ⅃ PDF

**Board and Treasury Department Announce Restructuring of Financial Support to AIG** ⏏ OFFSITE
**AIG Loan Facility »**

**Following tables summarize assets and outstanding principal balance of the Senior Loan and Fixed Deferred Purchase Price as at December 31, 2008**

*Outstanding Principal Balance of Senior Loan and Fixed Deferred Purchase Price*

| (in Millions) | Senior Loan | Fixed Deferred Purchase Price |
|---|---|---|
| Principal Balance at closing | $19,494 | $1,000 |
| Accrued and Capitalized Interest | 27 | 3 |
| Repayment during the period | - | - |
| **Principal Balance on 12/31/2008** | **$19,522** | **$1,003** |

*Summary of Portfolio Composition and Cash/Cash Equivalents*

| (in Millions) | Fair Value |
|---|---|
| Alt-A (ARM) | $5,226 |
| Subprime | 10,796 |
| Other[1] | 2,817 |
| Cash & Cash Equivalents[2] | 351 |
| **Total** | **$19,190** |

[1]Includes all asset sectors that, individually, represent less than 5% of aggregate outstanding fair value of the portfolio
[2]Including cash and cash equivalents on deposit in the Expense Reimbursement Sub-Account

*At December 31, 2008, the sector/rating composition of ML II LLC's $18.8 billion RMBS portfolio, as a percentage of aggregate fair value, was as follows:*

| RMBS Sector: | Rating[1] | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | AAA | AA+ to AA- | A+ to A- | BBB+ to BBB- | BB+ and lower | Total[3] |
| Alt-A (ARM) | 10.6% | 5.4% | 4.1% | 3.1% | 4.7% | 27.7% |
| Subprime | 22.5% | 8.5% | 6.7% | 6.8% | 12.7% | 57.3% |
| Other[2] | 7.1% | 1.1% | 0.8% | 4.4% | 1.5% | 15.0% |
| Total[3] | 40.1% | 15.0% | 11.6% | 14.3% | 18.9% | 100.0% |



**Portfolio Rating Distribution**

BB+ and lower 18.9%
BBB- to BBB- 14.3%
A+ to A- 11.6%
AA+ to AA- 15.0%
AAA 40.1%

**Portfolio Sector Distribution**

Other 15.0%
Alt-A (ARM) 27.7%
Subprime 57.3%

[1] Lowest of all ratings is used for the purposes of this table
[2] Includes all asset sectors that, individually, represent less than 5% of aggregate outstanding fair value of the portfolio
[3] Rows and columns may not total due to rounding

*At December 31, 2008, the RMBS held by ML II LLC were secured by properties at the locations identified below, as a percentage of the total unpaid principal balance of the underlying loans:*

| Geographic Location | Percentage[1] |
| --- | --- |
| California | 32.5% |
| Florida | 12.6% |
| Other[2] | 54.9% |
| Total | 100.0% |

## Geographic Concentration



[1] *Based on geographic location information that was available for approximately 88% of underlying mortgage loans by aggregate outstanding unpaid principal balance*
[2] *Includes all geographic locations that, individually, represent less than 5% of total aggregate outstanding unpaid principal balance of the underlying loans*



### AGUIRRE, MORRIS & SEVERSON LLP
#### ATTORNEYS AT LAW

444 West C Street, Suite 210
San Diego, CA 92101
Telephone (619) 876-5364
Facsimile (619) 876-5368

Michael J. Aguirre, Esq.
maguirre@amslawyers.com

*By Facsimile and*
 *United States Postal Service*

May 8, 2009

Honorable Timothy F. Geithner
Secretary of the Treasury
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

FOIA Request
Department of the Treasury
Washington, DC 20220

Re:   *Freedom of Information Act (FOIA) Request for Maiden Lane II*

Mr. Secretary:

The Asset Purchase Agreement for Maiden Lane II has an Annex A which provides for 6 columns of information as set forth below. Please provide the completed Annex A for all transactions for Maiden Lane II under the Maiden Lane II Asset Purchase Agreement.

Annex A to
Cash Purchase Price
Adjustment Amount
Certificate

#### CASH PURCHASE PRICE ADJUSTMENT AMOUNT

| A CUSIP | B Security Name | I Post 10/31/2008 Principal | J Post 10/31/2008 Interest | L Accrued Interest on amounts in columns I and J | Cash Purchase Price Adjustment Amount (I+J+L) |
|---|---|---|---|---|---|
| Total | | | | | |

The Asset Purchase Agreement for Maiden Lane KK has an Annex B which provides for 6 columns of information, as set forth below. Please provide the complete Annex B for all transactions for Maiden Lane II under the Maiden Lane II Asset Purchase Agreement.

Honorable Timothy F. Geithner
FOIA Request
May 7, 2009
Page 2


Annex B
to
Cash Purchase Price
Adjustment Amount
Certificate

### Cash Purchase Price Adjustment Amount for each Seller

Date: _____

| Seller | Seller's Participation Percentage | Cash Purchase Price Adjustment Amount for each Seller[1] | Amount by which the [final] [revised final] Cash Purchase Price Adjustment Amount exceeds (is less than) the [estimated] [prior final] Cash Purchase Price Adjustment Amount |
|---|---|---|---|
| ller 1 | [___]% | $[_____] | $[_____] |
| ller 2 | [___]% | $[_____] | $[_____] |
| ller 3 | [___]% | $[_____] | $[_____] |
| ller 4 | [___]% | $[_____] | $[_____] |
| ller 5 | [___]% | $[_____] | $[_____] |
| ller 6 | [___]% | $[_____] | $[_____] |
| ller 7 | [___]% | $[_____] | $[_____] |
| ller 8 | [___]% | $[_____] | $[_____] |
| ller 9 | [___]% | $ [_____] | $ [_____] |
| ller 10 | [___]% | $ [_____] | $ [_____] |
| ller 11 | [___]% | $ [_____] | $ [_____] |

[1]   For each Seller: the product of (x) such Seller's Participation Percentage as set forth in the
second column of this table and (y) the Cash Purchase Price Adjustment Amount for the
RMBS Pool as set forth in the last column of Annex A.

     I am requesting copies of the above-referenced documents and I agree to pay any and all
fees that might be incurred in responding to my request.

                                        Very truly yours,

                                        Michael J. Aguirre

# AGUIRRE, MORRIS & SEVERSON LLP
## ATTORNEYS AT LAW

444 West C Street, Suite 210
San Diego, CA 92101
Telephone (619) 876-5364
Facsimile (619) 876-5368

Michael J. Aguirre, Esq.
maguirre@amslawyers.com

COPY

*By Facsimile and*
  *United States Postal Service*

May 11, 2009

Honorable Timothy F. Geithner
Secretary of the Treasury
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

FOIA Request
Department of the Treasury
Washington, DC 20220

   *Re: Freedom of Information Act (FOIA) Request for Maiden Lane III*

Mr. Secretary:

  The Shortfall Agreement between Maiden Lane III LLC and AIG Financial Products Corp. states that AIG-FP was party to the derivative transactions listed on Schedule A hereto with an aggregate notional value of $53,510,385,969. Please provide the Schedule A list of transactions comprising the $53 billion in notional value. Please provide documents showing the names of the parties to the derivative transactions on Schedule A, the dates of the transactions, all counterparties to the transactions, the amounts of each individual transaction, the nature of the transaction, the underlyings for each transactions and any related correspondence or emails.

  The Shortfall Agreement between Maiden Lane III LLC and AIG Financial Products provides that ML III has entered into a forward purchase agreement with each counterparty to the Derivative Transactions (the purchase agreements) in connection with obtaining certain loans and equity contributions. Please provide any such forward purchase agreement, documents showing the names of any counterparties to such agreements, the dates of such agreements, the amounts for such agreements, and any related correspondence or emails.

Honorable Timothy F. Geithner
FOIA Request
May 11, 2009
Page 2

The Shortfall Agreement between Maiden Land II LLC and AIG Financial Products states that Maiden Lane III has delivered collateral to the counterparties to the Derivative Transactions as set forth on Schedule A. Please provide documents that show such collateral and all such counterparties.

Very truly yours,

Michael J. Aguirre
Aguirre, Morris & Severson



# DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

SEP 1 2009

Re:   2009-05-022, 2009-05-023
      2009-05-024, 2009-05-026
      SAM:ALB:PS

By Fax and First Class Mail
Michael Aguirre, Esq.
Aguirre, Morris & Severson LLP
444 West C Street, Suite 210
San Diego, CA 92101

Dear Mr. Aguirre:

This letter responds to your four Freedom of Information Act requests seeking access to certain records pertaining to "Maiden Lane II" and "Maiden Lane III," two limited liability companies which were formed to facilitate the restructuring of the Federal Reserve Bank of New York's financial support to American International Group.

A search was conducted of the Department's files, but no records were located that are responsive to any of your requests.

If you are dissatisfied with my action on your request, you may appeal within 35 days from the date of this letter. Your appeal must be in writing, signed by you or your representative, and should contain the rationale for the appeal. Your appeal should be addressed to:

Freedom of Information Appeal
Disclosure Services, DO
Department of the Treasury
Washington, DC 20220

Sincerely,

Stephen A. Moffett
Administrative Officer
Office of Financial Stability

**AGUIRRE, MORRIS & SEVERSON LLP**
ATTORNEYS AT LAW

COPY

444 West C Street, Suite 210
San Diego, CA 92101
Telephone (619) 876-5364
Facsimile (619) 876-5368

Michael J. Aguirre, Esq.
maguirre@amslawyers.com

*Via Facsimile – (202) 622-3895
and U.S. Mail*

September 22, 2009

Freedom of Information Appeal
Disclosure Services, DO
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20020

     Re:    Appeal 2009-05-022, 2009-05-023, 2009-05-024, 2009-05-26

    By letter dated 1 September 2009 you have indicated that the US Treasury does not have documents responsive to my request. I hereby appeal this decision and challenge the accuracy of it. Treasury officials have possession, custody or control over the records sought. The Office of Financial Stability within the Treasury has possession, custody or control of the documents sought. GAO report 09-975 further shows Treasury officials work directly with Federal Reserve officials jointly on monitoring Maiden Lane II and III. These documents are within the possession, custody or control of those Treasury officials.

    This administration has promised and represented to the American people that it would be forthcoming with FOIA requested documents. Please respect the law and produce the documents.

                  Very truly yours,

                  Michael J. Aguirre, Esq.



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

RECEIVED

OCT 2 3 2009

BY:_____

October 20, 2009

Re:    2009-05-022, 2009-05-023
       2009-05-024, 2009-05-026
       DDM:JJS:ALB

BY FACSIMILE & FIRST CLASS MAIL

Michael J. Aguirre, Esq.
Aguirre, Morris & Severson LLP
444 West C Street, Suite 210
San Diego, CA 92101

Dear Mr. Aguirre:

You appealed from the actions of the Department of the Treasury on your above-captioned requests for access to certain records pertaining to "Maiden Lane II" and "Maiden Lane III."

After carefully considering your appeal, I am affirming the Department's actions on your requests.  By letter dated September 1, 2009, the Department informed you that it was unable to locate any responsive records in its files.  Subsequent to your appeal, the Department conducted a second search but it did not locate any records responsive to your request.  I have determined that the Department's initial response was correct, and that it has conducted an adequate, reasonable search for responsive records.

On appeal, you assert that "Treasury officials have possession, custody or control over the records sought."  I note that the Department has, in fact, located records that reference Maiden Lane II and Maiden Lane III.  However, upon review, the Department properly determined that none of those records are responsive to your specific requests.

If you are dissatisfied with my action on your appeal, you may file a lawsuit in the United States District Court for the judicial district in which you reside or have your principal place of business, the judicial district in which the requested records are located, or the District of Columbia, in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Duane D. Morse
Chief Risk and Compliance Officer

**Lambright, James**

| | |
|---|---|
| From: | Rutherford, Matthew |
| Sent: | Friday, November 07, 2008 5:06 PM |
| To: | Davis, Michele; Zuccarelli, Jennifer; McLaughlin, Brookly; Via, Stafford; Ryan, Tony; Lambright, James; Myrow, Stephen |
| Subject: | Total USG Exposure to AIG |

All:

The charts below detail the total amount of current and potential exposure the USG has to AIG before and after the potential investment.  It should be helpful for the press next week and some derivative of it will be in the justification memo.

*Pre-Investment Exposure***

| | Current | Potential |
|---|---|---|
| FRBNY Senior Credit Facility | $61 | $85 |
| FRBNY Sec Lending Facility | $20 | $37.8 |
| FRBNY CPFF | n/a | $21 |
| Total | $81 | $144 |

* As of November 6

*Post-Investment Exposure*

| | Hyothetical | Potential |
|---|---|---|
| FRBNY Senior Credit Facility* | $21 | $60 |
| FRBNY Maiden Lane II | $23 | $23 |
| FRBNY Maiden Lane III | $30 | $30 |
| FRBNY CPFF | n/a | $21 |
| Treasury Preferred | $40 | $40 |
| Total | $74 | $174 |

* Assumes no additional draw down on Friday November 7

1

1236

**Braun, James**

| | |
|---|---|
| **From:** | Albrecht, Stephen |
| **Sent:** | Tuesday, December 16, 2008 12:06 PM |
| **To:** | Lambright, James; Hsu, Michael; Grippo, Gary; Morse, Duane |
| **Cc:** | Spurry, Steven; Fiechter, Jonathan |
| **Subject:** | RE: AIG Risk Assessment |

Under our agreement, we will be getting the same financial reporting that FRBNY is getting under their lending facility. Our information is supposed to be sent to the TARP compliance office. Without getting into detail, I know it is a very robust set of reporting. I would suggest talking to the FRBNY to discuss the data that is being reported, what has been useful, etc., given they have been dealing with this data for a while, and we now have rights to the exact same info.

---

**From:** Lambright, James
**Sent:** Tuesday, December 16, 2008 11:39 AM
**To:** Hsu, Michael; Grippo, Gary; Morse, Duane; Albrecht, Stephen
**Cc:** Spurry, Steven; Fiechter, Jonathan
**Subject:** Re: AIG Risk Assessment

Mike, I've alsob looped in Duane and Steve to get a readout on what we have the right to demand from AIG as we monitor program performance vs what we will merely be asking politely for. Thanks.

---

**From:** Hsu, Michael
**To:** Grippo, Gary
**Cc:** Spurry, Steven; Fiechter, Jonathan; Lambright, James
**Sent:** Tue Dec 16 11:33:13 2008
**Subject:** AIG Risk Assessment

Gary,

Before Steve and I embark on a risk assessment of the AIG investment (see email chain below and attachment), Lambright suggested that we touch base with you about what information TARP has gotten and will get via BONY from TARP's position as a preferred equity holder.

Maybe we can touch base briefly later today?

Thanks,
-mike

---

**From:** Lambright, James
**Sent:** Monday, December 15, 2008 9:17 PM
**To:** Fiechter, Jonathan
**Cc:** Kashkari, Neel; Schweitzer, Howard; Morse, Duane; Abdelrazek, Rawan; Hsu, Michael; Spurry, Steven; Miller, David N
**Subject:** RE: AIG Risk Assessment

Thanks, Jonathan, for the thought your team and you are putting into this.  My additions to your note:

- Section II: perhaps this would naturally be included in your discussion of the derivatives portfolio, but we should monitor the status of the newly created Fed facilities to reduce AIG's exposure to collateral calls associated with these securities.

1

1069

■   Section II and/or Looking Ahead: We should monitor the posture of the ratings agencies and their primary
concerns (eg, debt:equity levels, exposure to collateral calls, etc).

Thanks,
Jim

---

**From:** Fiechter, Jonathan
**Sent:** Monday, December 15, 2008 11:19 AM
**To:** Lambright, James
**Cc:** Kashkari, Neel; Schweitzer, Howard; Morse, Duane; Myrow, Stephen; Abdelrazek, Rawan; Hsu, Michael; Spurry,
Steven
**Subject:** AIG Risk Assessment

Jim,

As you know we are obligated by EESA to determine the effectiveness of TARP investments.
While much of the focus has understandably been on the CPP, we also need to stay on top of
how our investments in AIG (and soon CITI) have met the underlying objectives of act. I am
following up on a note that I sent our last week (see below).

The objectives of the AIG investment under the SSFI were laid out very well in your note that
went to the Investment Committee.  We would propose to follow up on the TARP investment by
preparing a risk assessment note that spells out the objectives (based on your note) and then
create both a benchmark for AIG today and then establish metrics to track AIG's progress (or
lack thereof) in coming months.  Steve and Mike have put together the attached outline of
what would be covered in the risk note and have proposed spending some time with the NYFed
examiners of AIG to gather information and get their take on the situation.

Before scheduling any conversations/visits with folks at the NYFed folks (they personally
know the AIG examiners), they wanted to meet with you to find out what information you (or
your team has), any steps along these lines that you are planning, and to get a sense of what
additional info you might like. In particular, we want to make sure we're leveraging your
work and not reinventing the wheel.

I recognize how busy you are on Detroit but when you get the chance, I'd appreciate your
giving them your reaction to the attached.

Thanks,

Jonathan


Jonathan L Fiechter
Interim Chief Risk Officer,
Troubled Asset Relief Program
US Department of the Treasury
202-622-8722 (office)

---

**From:** Fiechter, Jonathan
**Sent:** Wednesday, December 10, 2008 11:45 AM
**To:** Wolfteich, Paul; Bloom, Tom; Schweitzer, Howard; Lambright, James; Mclellan, Don; Morse, Duane; Grippo, Gary;
Abdelrazek, Rawan

1070

**Cc:** Bull, Whitney; Hsu, Michael; Spurry, Steven; Struckmeyer, Charles
**Subject:** AIG

As part of the TARP mandate regarding assessments of the effectiveness of the use of TARP funds, I recommend that a note on the SSFI program (and the TARP investment in AIG) be prepared. Presumably, the note would lay out the objectives of the SSFI injection based on Jim Lambright's note on AIG and then make an assessment of how well these objectives were (are being) met and the risk that additional funds might be needed. As with other TARP programs, one of the challenges will be assessing the effect of TARP in combination with the other government actions.

I would propose that Steve and Mike take a crack at preparing such a note (Steve and Mike know the folks at the NY Fed who are in AIG right now and could try to get information on the outstanding AIG exposures.

But before asking them to do this, I wanted to double-check that others are not already doing this. Don Hammond and I had talked about a team going up to the NY Fed and AIG – Don was going to take the lead in arranging the meeting but I am not certain how far he got.

Jonathan

---

3

**TARP AIG SSFI Investment**

**Senior Preferred Stock and Warrant**

<u>**Summary of Senior Preferred Terms**</u>

| | |
|---|---|
| **Issuer:** | American International Group, Inc. ("AIG"). |
| **Initial Holder:** | United States Department of the Treasury (the "UST"). |
| **Size:** | $40 Billion aggregate liquidation preference. |
| **Security:** | Senior Preferred, liquidation preference $10,000 per share; provided that UST may, upon transfer of the Senior Preferred, require AIG to appoint a depositary to hold the Senior Preferred and issue depositary receipts. |
| **Ranking:** | Senior to common stock and pari passu with existing preferred shares other than preferred shares which by their terms rank junior to the Senior Preferred. At the meeting of stockholders called to effect the amendments to AIG's Restated Certificate of Incorporation contemplated by the terms of the convertible preferred stock, AIG shall propose an amendment to its Restated Certificate of Incorporation to allow the Senior Preferred to rank senior to the convertible preferred stock. |
| **Term:** | Perpetual life. |
| **Dividend:** | The Senior Preferred will accrue cumulative dividends at a rate of 10% per annum. Dividends will be payable quarterly in arrears on February 1, May 1, August 1 and November 1 of each year. Dividends will be payable when, as and if declared by the Board of Directors of AIG. Accrued but unpaid dividends shall compound quarterly. |
| **Redemption:** | At any time that (i) the AIG Credit Facility Trust (or any successor entity established for the benefit of the United States Treasury) "beneficially owns" less than 30% of the aggregate voting power of AIG's voting securities and (ii) no holder of the Senior Preferred controls AIG, then AIG may redeem the Senior Preferred in whole or in part at a redemption price equal to 100% of its liquidation preference, plus an amount equal to accrued and unpaid dividends (including, if applicable, dividends on such amount). "Control" for this purpose means the power to direct the management and policies of AIG, directly or indirectly, whether through the ownership of voting securities, by contract, by the power to control AIG's Board of Directors or otherwise. "Beneficially owns" is as defined in Rule 13d-3 under the Securities Exchange Act of 1934.  For the avoidance of doubt, while there is AIG's Board of Directors control (or the potential to gain AIG's Board of Directors control) by the holder of the Senior Preferred, then AIG is not permitted to redeem the Senior Preferred. |
| **Restrictions on Dividends:** | Subject to certain exceptions, for as long as any Senior Preferred |

is outstanding, no dividends may be declared or paid on junior preferred shares, preferred shares ranking pari passu with the Senior Preferred ("Parity Stock"), or common shares (other than (i) in the case of pari passu preferred shares, dividends on a pro rata basis with the Senior Preferred and (ii) in the case of junior preferred shares, dividends payable solely in common shares), nor may AIG repurchase or redeem any junior preferred shares, preferred shares ranking pari passu with the Senior Preferred or common shares, unless all accrued and unpaid dividends for all past dividend periods on the Senior Preferred are fully paid or declared and a sum sufficient for the payment thereof set apart.

**Common dividends:**   The UST's consent shall be required for any increase in common dividends per share until the fifth anniversary of the date of this investment unless prior to such fifth anniversary the Senior Preferred is redeemed in whole or the UST has transferred all of the Senior Preferred to third parties.

**Repurchases:**   The UST's consent shall be required for repurchases of any common shares, other capital stock, trust preferred securities or other equity securities (other than (i) repurchases of the Senior Preferred, (ii) repurchases of junior preferred shares or common shares ("Junior Stock") in connection with the administration of any employee benefit plan in the ordinary course of business and consistent with past practice (including purchases to offset share dilution pursuant to a publicly announced repurchase plan), (iii) any redemption or repurchase of rights pursuant to any stockholders' rights plan and (iv) the exchange or conversion of Junior Stock for or into other Junior Stock or of Parity Stock or trust preferred securities for or into other Parity Stock (with the same or lesser aggregate liquidation amount) or Junior Stock, in each case, solely to the extent required pursuant to binding contractual agreements entered into prior to the signing date of UST's agreement to purchase the Senior Preferred or any subsequent agreement for the accelerated exercise, settlement or exchange thereof for common stock), until the fifth anniversary of the date of this investment unless prior to such fifth anniversary the Senior Preferred is redeemed in whole or the UST has transferred all of the Senior Preferred to third parties. Notwithstanding the foregoing, following the redemption in whole of the Senior Preferred held by UST or the transfer by UST of all of the Senior Preferred to one or more third parties not affiliated with UST, AIG may repurchase, in whole or in part, at any time the Warrant then held by UST at the fair market value of the Warrant so long as no holder of the Warrant controls AIG as provided in clause (ii) of "Redemption" above.

**Voting rights:**   The Senior Preferred shall be non-voting, other than class voting rights on (i) any authorization or issuance of shares other than the convertible preferred stock ranking senior or pari passu to the Senior Preferred, (ii) any amendment that adversely affects the rights of Senior Preferred, or (iii) any merger, exchange or similar transaction unless the Senior Preferred remains outstanding or is converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent and the Senior Preferred or such preference shares have such rights, preferences, privileges and voting powers, and limitations and restrictions thereof, taken as a whole, as are not materially less

2

favorable to the holders thereof than those of the Senior Preferred immediately prior to such transaction, taken as a whole.

If dividends on the Senior Preferred are not paid in full for four dividend periods, whether or not consecutive, the Senior Preferred will have the right to elect the greater of 2 directors and a number of directors (rounded upward) equal to 20% of the total number of directors after giving effect to such election. The right to elect directors will end when full dividends have been paid for all past dividend periods.

**Transferability:**     The Senior Preferred will not be subject to any contractual restrictions on transfer other than such as are necessary to insure compliance with U.S. federal and state securities laws. AIG will file a registration statement (which may be a shelf registration statement) covering the Senior Preferred as promptly as practicable, but in any event within 15 days, after notification by the UST and, if necessary, shall take all action required to cause such registration statement to be declared effective as soon as possible. During any period that an effective registration statement is not available for the resale by the UST of the Senior Preferred, AIG will also grant to the UST piggyback registration rights for the Senior Preferred and will take such other steps as may be reasonably requested to facilitate the transfer of the Senior Preferred including, if requested by the UST, using reasonable best efforts to list the Senior Preferred on a national securities exchange. If requested by the UST, AIG will appoint a depositary to hold the Senior Preferred and issue depositary receipts.

**Claim in Bankruptcy:**     Equity claim with liquidation preference to common equity claim.

**Acceleration Rights:**     None

**Use of Proceeds:**     To repay the senior secured revolving credit facility governed by the Credit Agreement dated as of September 22, 2008 (the "Credit Agreement") between AIG and the Federal Reserve Bank of New York ("FRBNY").

**Tax Treatment:**     Dividends on the Senior Preferred are non tax-deductible to AIG.

**Restrictions on Expenses:**     AIG shall continue to maintain and implement its comprehensive written policy on corporate expenses and distribute such policy to all AIG employees.  Such policy, as may be amended from time to time, shall remain in effect at least until such time as any of the shares of the Senior Preferred are owned by the UST. Any material amendments to such policy shall require the prior written consent of the UST until such time as the UST no longer owns any shares of Senior Preferred, and any material deviations from such policy, whether in contravention thereof or pursuant to waivers provided for thereunder, shall promptly be reported to the UST.  Such policy shall, at a minimum:  (i) require compliance with all applicable law; (ii) apply to AIG and all of its subsidiaries; (iii) govern (a) the hosting, sponsorship or other

payment for conferences and events, (b) the use of corporate aircraft, (c) travel accommodations and expenditures, (d) consulting arrangements with outside service providers, (e) any new lease or acquisition of real estate, (f) expenses relating to office or facility renovations or relocations and (g) expenses relating to entertainment or holiday parties; and (iv) provide for (a) internal reporting and oversight and (b) mechanisms for addressing non-compliance with the policy.

**Restrictions on Lobbying:**    AIG shall continue to maintain and implement its comprehensive written policy on lobbying, governmental ethics and political activity and distribute such policy to all AIG employees and lobbying firms involved in any such activity. Such policy, as may be amended from time to time, shall remain in effect at least until such time as any of the shares of the Senior Preferred are owned by the UST. Any material amendments to such policy shall require the prior written consent of the UST until such time as the UST no longer owns any shares of Senior Preferred, and any material deviations from such policy, whether in contravention thereof or pursuant to waivers provided for thereunder, shall promptly be reported to the UST. Such policy shall, at a minimum: (i) require compliance with all applicable law; (ii) apply to AIG and all of its subsidiaries and affiliated foundations; (iii) govern (a) the provision of items of value to any government officials, (b) lobbying and (c) political activities and contributions; and (iv) provide for (a) internal reporting and oversight and (b) mechanisms for addressing non-compliance with the policy.

**Reporting:**    Except as otherwise agreed, AIG shall provide the UST (i) the information required to be provided by AIG to the FRBNY pursuant to Section 5.04 of the Credit Agreement, (ii) the notices required by Section 5.05 of the Credit Agreement, in each case within the time periods for delivery thereof specified in the Credit Agreement and (iii) such executive compensation information as is required for purposes of the Emergency Economic Stabilization Act of 2008 ("EESA") and the regulations and guidelines thereunder; provided that, after the termination of the Credit Agreement, such informational and notice requirements as are provided in Section 5.04 and Section 5.05 of the Credit Agreement shall remain in full force and effect until such time as the UST no longer owns any shares of Senior Preferred. In addition, AIG shall promptly provide the UST such other information and notices as the UST may reasonably request from time to time.

**Executive Compensation:**    As a condition to the closing of this investment, AIG shall be subject to the executive compensation and corporate governance requirements of Section 111(b) of the EESA and the UST's guidelines that carry out the provisions of such subsection for systemically significant failing institutions as set forth in Notice 2008-PSSFI. Accordingly, as a condition to the closing of this investment, AIG and its senior executive officers covered by the EESA ("SEOs") shall modify or terminate all benefit plans, arrangements and agreements (including golden parachute agreements) to the extent necessary to be in compliance with,

4

and following the closing and for so long as the UST holds any equity or debt securities of AIG issued under this agreement (the "Relevant Period"), AIG shall agree to be bound by the executive compensation and corporate governance requirements of Section 111(b) of the EESA and the guidelines set forth in Notice 2008-PSSFI. As an additional condition to the closing, AIG and its SEOs shall grant to the UST and the SEOs shall grant to AIG waivers releasing the UST, and, in the case of the SEOs release, AIG, from any claims that AIG and such SEOs may otherwise have as a result of any modification of the terms of any benefit plans, arrangements and agreements to eliminate any provisions that would not be in compliance with the executive compensation and corporate governance requirements of Section 111 of the EESA and the guidelines set forth in Notice 2008-PSSFI.

In addition to Notice 2008-PSSFI, the following will apply:

1.  AIG shall undertake during the Relevant Period to limit any golden parachute payments to its most senior employee group, who are currently referred to as Senior Partners ("Senior Partners"), (other than its SEOs) to the amounts permitted by the regulations relating to participants in the EESA Capital Purchase Program and the guidelines and Interim Final Rule (31 CFR Part 30) relating thereto as if they were SEOs (except that equity denominated awards settled solely in equity shall not be included in such limit), and AIG shall grant the UST a waiver releasing the UST, and shall use its best efforts to obtain waivers from the Senior Partners releasing the UST and AIG, from claims that AIG may have against the UST and that such Senior Partners may have against the UST or AIG as a result of such limits, and shall have obtained such waivers from AIG and its U.S.-based Senior Partners prior to and as an additional condition to the closing.

2.  The annual bonus pools payable to Senior Partners in respect of each of 2008 and 2009 shall not exceed the average of the annual bonus pools paid to Senior Partners for 2006 and 2007 (in each case exclusive of AIG's historic quarterly bonus program, the amount of which will not increase for any participant, and subject to appropriate adjustment for new hires and departures).

**Risk Management Committee:** AIG shall establish, within 30 days of the issuance of the Senior Preferred, and maintain, at least until the UST ceases to own any shares of the Senior Preferred, the Warrant or any other equity or debt securities of AIG, a risk management committee of the AIG's Board of Directors that will oversee the major risks involved in AIG's business operations and review AIG's actions to mitigate and manage those risks.

**Miscellaneous:** The dividend rate as provided in "Dividend" above is subject to adjustment in the sole discretion of the Secretary of the Treasury in light of, inter alia, then-prevailing economic conditions and the financial condition of AIG, with the objective of protecting the U.S. taxpayer.

(NY) 07865/002/TERMSHEET/AIG.Term.Sheet.doc

## Summary of Warrant Terms

**Warrant:**  The UST will receive a warrant ("Warrant") to purchase a number of shares of common stock of AIG ("Common Stock") equal to 2% of the issued and outstanding shares of Common Stock on the date of investment. The initial exercise price for the Warrant shall be $2.50 per share of Common Stock (representing the par value of the Common Stock on the date of the investment), subject to customary anti-dilution adjustments; provided that the initial exercise price per share of Common Stock shall be adjusted to the par value per share of the Common Stock following the amendments to AIG's Restated Certificate of Incorporation contemplated by the terms of the convertible preferred stock. The Warrant shall be net share settled or, if consented to by AIG and the UST, on a full physical basis.

**Term:**  10 years

**Exercisability:**  Immediately exercisable, in whole or in part.

**Transferability:**  The Warrant will not be subject to any contractual restrictions on transfer other than such as are necessary to ensure compliance with U.S. federal and state securities laws. AIG will file a registration statement (which may be a shelf registration statement) covering the Warrant and the Common Stock underlying the Warrant as promptly as practicable, but in any event within 15 days after notification by the UST, and, if necessary, shall take all action required to cause such registration statement to be declared effective as soon as possible. During any period that an effective registration statement is not available for the resale by the UST of the Warrant or the Common Stock underlying the Warrant, AIG will also grant to the UST piggyback registration rights for the Warrant and the Common Stock underlying the Warrant. AIG will apply for the listing on the New York Stock Exchange of the Common Stock underlying the Warrant and will take such other steps as may be reasonably requested to facilitate the transfer of the Warrant and the underlying Common Stock.

**Voting:**  The UST will agree not to exercise voting power with respect to any shares of Common Stock issued to it upon exercise of the Warrant.

**Substitution:**  In the event AIG is no longer listed or traded on a national securities exchange the Warrant will be exchangeable (in whole or in part), at the option of the UST, for an economic interest (to be determined by the UST after consultation with AIG) of AIG classified as permanent equity under GAAP having a fair market value (as determined by the UST) equal to the portion of the Warrant so exchanged.

6



℘JS 44   (Rev. 12/07)     **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
MICHAEL J. AGUIRRE

## DEFENDANTS
UNITED STATES DEPARTMENT OF THE TREASURY

2009 NOV 13

**(b)** County of Residence of First Listed Plaintiff   San Diego County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

'09 CV 2556 JAH      POR

BY _____ DEPUTY

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Aguirre, Morris & Severson, LLP, (619) 876-5364
444 West C Street, Suite 210, San Diego, CA 92101

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☒ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☒ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
5 U.S.C. Sec. 552
Brief description of cause:
Freedom of Information Act ("FOIA")

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE   11/12/2009

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #  7256   AMOUNT  350.00   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

MS 11/13/09

Court Name: USDC California Southern
Division: 3
Receipt Number: CAS007256
Cashier ID: msweaney
Transaction Date: 11/13/2009
Payer Name: AGUIRRE MORRIS AND SEVERSON
------------------------------------
CIVIL FILING FEE
 For: AGUIRRE US DEPT OF TREASURY
 Case/Party: D-CAS-3-09-CV-002556-001
 Amount:        $350.00
------------------------------------
CHECK
 Check/Money Order Num: 1201
 Amt Tendered:  $350.00
------------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.